IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| W. L. PETREY WHOLESALE CO., INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACT. NO.  2:14-CV-868-CSC |
| | ) | (WO) |
| GREAT AMERICAN INSURANCE | ) | |
| COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Before the court are the motions to dismiss, or, alternatively, motions for summary judgment (Doc. 9 & Doc. 18) filed by the Defendant, Great American Insurance Company. The claims in this case arise under the laws of the State of Alabama and concern a dispute over insurance coverage for employee theft.  The parties are diverse and the amount in controversy exceeds $75,000.00; accordingly, the court has jurisdiction over this case pursuant to 28 U.S.C. § 1332(a).  Pursuant to 28 U.S.C. § 636(c)(1) and M.D. Ala. LR 73.1, the parties have consented to a United States Magistrate Judge conducting all proceedings in this case and ordering the entry of final judgment.  For the reasons stated in this memorandum opinion, the court concludes that summary judgment is due to be granted and that the Plaintiff's claims are due to be dismissed with prejudice.

**I.   Standard of Review**

"Summary judgment is appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no

genuine [dispute[1]] as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *Greenberg v. BellSouth Telecomm., Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007) (per curiam) (citation omitted); Fed. R. Civ. P. 56(a) ("The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.").  The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the [record, including pleadings, discovery materials and affidavits], which it believes demonstrate the absence of a genuine [dispute] of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The movant may meet this burden by presenting evidence which would be admissible at trial indicating there is no dispute of material fact or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof.  *Id.* at 322–324.

Once the movant meets his evidentiary burden and demonstrates the absence of a genuine dispute of material fact, the burden shifts to the non-moving party to establish, with appropriate evidence beyond the pleadings, that a genuine dispute material to his case exists.  *Celotex*, 477 U.S. at 324; *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *see also* Fed. R. Civ. P. 56(c) ("A party asserting that a fact cannot be or is genuinely

---

[1]Effective December 1, 2010, the language of Rule 56(a) was amended. The word "dispute" replaced the word "issue" to "better reflect [ ] the focus of a summary-judgment determination."  Fed. R. Civ. P. 56(a), Advisory Committee Notes, 2010 Amendments.

disputed must support the assertion by: (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.").  A genuine dispute of material fact exists when the nonmoving party produces evidence that would allow a reasonable fact-finder to return a verdict in its favor.  *Greenberg*, 498 F.3d at 1263.

To survive the movant's properly supported motion for summary judgment, a party is required to produce "sufficient [favorable] evidence" "that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986).  "If the evidence [on which the nonmoving party relies] is merely colorable ... or is not significantly probative ... summary judgment may be granted." *Id.* at 249–250. "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the [trier of fact] could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1576–1577 (11th Cir. 1990) (quoting *Anderson*, *supra*). Conclusory allegations based on subjective beliefs are likewise insufficient to create a genuine dispute of material fact and, therefore, do not suffice to oppose a motion for summary judgment. *Waddell v. Valley Forge Dental Assocs., Inc.*, 276 F.3d 1275, 1279 (11th Cir. 2001).  Hence, when a nonmoving party fails to set forth specific facts supported by

appropriate evidence sufficient to establish the existence of an element essential to its case and on which the nonmovant will bear the burden of proof at trial, summary judgment is due to be granted in favor of the moving party. *Celotex*, 477 U.S. at 322 ("[F]ailure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.").

For summary judgment purposes, only disputes involving material facts are relevant. *United States v. 5800 SW 74th Ave.*, 363 F.3d 1099, 1101 (11th Cir. 2004). What is material is determined by the substantive law applicable to the case. *Anderson*, 477 U.S. at 248; *Lofton v. Sec'y of Dep't of Children & Family Servs.,* 358 F.3d 804, 809 (11th Cir. 2004) ("Only factual disputes that are material under the substantive law governing the case will preclude entry of summary judgment."). "The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case." *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1243 (11th Cir. 2003) (citation omitted). To demonstrate a genuine dispute of material fact, the party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts.... Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine [dispute] for trial.'" *Matsushita Elec. Indus. Co, Ltd., v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In cases where the evidence before the court which is admissible on its face or which can be reduced to admissible form indicates that there is no genuine dispute of material fact and that

the party moving for summary judgment is entitled to it as a matter of law, summary judgment is proper. *Celotex*, 477 U.S. at 323–324 (summary judgment appropriate where pleadings, evidentiary materials and affidavits before the court show there is no genuine dispute as to a requisite material fact); *Waddell*, 276 F.3d at 1279 (to establish a genuine dispute of material fact, the nonmoving party must produce evidence such that a reasonable trier of fact could return a verdict in his favor). However, if there is a conflict in the evidence, "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255; *Ruiz de Molina v. Merritt & Furman Ins. Agency*, 207 F.3d 1351, 1356 (11th Cir. 2000).

## II.    Facts

### A.    Petrey Wholesale's Business Operations

Petrey Wholesale, Inc., is a wholesale distributor of goods and supplies to convenience stores. (Doc. 21-1 p. 24). One of the products Petrey Wholesale distributes is a drink called "5-Hour Energy." "5–hour ENERGY is an 'energy shot.' The drink is 1.93 to 2 ounces and is sold in retail stores across the country in a number of fruit flavors, and regular, extra strength, and decaffeinated varieties." *Podobedov v. Living Essentials, LLC*, 2012 WL 2513458 (C.D. Cal. 2012).

Petrey Wholesale hires sales persons for its delivery routes, and each sales person is provided with a delivery truck. (Doc. 21-1 p. 24). The sales person leases a storage unit in which to store goods from Petrey Wholesale prior to delivery. *Id*. Each sales person orders

goods from Petrey Wholesale according to each customer's need, Petrey Wholesale delivers the goods to the storage unit, and the sales person delivers the goods to the customers and accounts for the deliveries by entering the relevant data in a computer system. *Id*. Excess stock or return merchandise is shipped back to the warehouse when necessary. (Doc. 21-1 p. 25). At least twice per year, a physical inventory is conducted for each route salesman's truck and storage facility. *Id*.

**B.    Petrey Wholesale's Employee Dishonesty Insurance Policy**

From July 1, 2010 to July 11, 2011, Petrey Wholesale held a business insurance and crime protection policy from Great American Insurance Company ("Great American"). (Doc. 21-1 p. 138). That policy was subsequently renewed and was in force through July 1 2013. (Doc. 21-1 p. 142; Doc. 21-1 p. 42). The insurance policy provided:

**Employee Dishonesty**

We will pay for loss of, and loss from damage to, money, securities, and other property resulting directly from dishonest acts committed by an employee, whether identified or not, acting alone or in collusion with other persons, with the manifest intent to:

a.    cause you to sustain loss; and also
b.    obtain financial benefit (other than employee benefits earned in the normal course of employment, including: salaries, commissions, fees, bonuses, promotions, awards, profit sharing or pensions) for:
(1) the employee; or
(2) any person or organization intended by the employee to receive that benefit.

EXCLUSIONS:
. . . .We will not pay for loss as specified below:
. . . Inventory Shortages:

6

Loss, or that part of any loss, the proof of which as to its existence or amount
    is dependent upon:
a.) an inventory computation; or
b.) a profit and loss computation.

(Doc. 21-1 pp. 46, 51, 116, 121).

**C.    Jason McKean**

From March 15, 2010, to June 6, 2011, Jason McKean was a route delivery driver for Petrey Wholesale in Shreveport, Louisianna. (Doc. 21-1 p. 71). On June 6, 2011, McKean's supervisor, Bill Ashworth, could not reach him by telephone, so he drove to Shreveport and found that McKean had abandoned the job. *Id*. Ashworth immediately noticed that there appeared to be a shortage of remaining merchandise in McKean's truck and storage unit, so he began to take a physical inventory of the items. *Id*. After the physical inventory was taken of the remaining items from McKean's truck and storage facility, the number of missing items were subtracted from the computer's records of the number of items that should have been in McKean's possession. (Doc. 21-1 p. 72). This price comparison revealed a shortage of items totaling $122,899 in value based on inventory cost. *Id*. The vast majority of the missing inventory consisted of 5-Hour Energy drinks. *Id*.

In addition, a complete reconstruction of all transactions for McKean's route was performed, beginning with a physical inventory performed on December 15, 2010. *Id*. All shipments and transfers of product to McKean were added to that figure, and returned merchandise was subtracted from the figure to determine the amount of inventory that should have been in McKean's possession on June 9, 2011. *Id*. Petrey Wholesale filed a police

7

report about the theft.  (Doc. 21-1 p. 110).  In response to a letter from Petrey Wholesale, Jason McKean telephoned Petrey Wholesale and denied stealing inventory.  (Doc. 21-1 p. 73).

Petrey Wholesale submitted a claim for loss of the missing inventory to Great American.  (Doc. 21-1 p. 171).  Petrey Wholesale's proof of loss was primarily based on its calculations comparing sales and inventory records with the results of the physical inventory of the remaining merchandise from McKean's route.  *Id*.  After confirming that McKean was the only person who had access to the missing inventory, Great American paid the claim.  (Doc. 21-1 pp. 109-110, 171).

**D.    Justin Bree**

Justin Bree was a route delivery driver for Petrey Wholesale from August 16, 2007 to May 24, 2013.  (Doc. 21-1 p. 32).  On May 24, 2013, his employment was terminated after one of Petrey Wholesale's customers requested that Bree no longer service its store.  (Doc. 21-1 p. 33).  At the time of his termination, Petrey Wholesale took from Bree his truck, its contents, and the computer equipment used on his route.  (Doc. 21-1 p. 25).  Bree's truck was turned over to a relief driver to finish the route, and Bree's supervisors went to Bree's storage unit and changed the locks on it.  (Doc. 21-1 pp. 25-26).

On June 26, 2013, Steve Carter, a general manager at Petrey Wholesale, was reviewing route inventory reports when he noticed that the inventory numbers for 5-Hour Energy products on Bree's route were exceptionally high.  (Doc. 21-1 p. 26).  He

immediately ordered an audit of the records and a physical inventory of Bree's remaining route inventory.  *Id*.  A physical inventory was performed on June 28, 2013.  *Id*.  Scott Rayburn, who is responsible for inventory accounting at Petrey Wholesale, compared Petrey Wholesale's computer-generated inventory records with the results of the physical inventory, and the results of this calculation indicated an inventory shortage of 82,510 bottles of 5-Hour Energy drinks valued at $111,415.35.  (Doc. 21-1 pp. 25-26).  Rayburn also compared the results of the June 28, 2013, physical inventory with a physical inventory conducted on January 15, 2013, which, after accounting for Bree's sales and all interim shipments of merchandise to and from Bree, confirmed that 82,510 bottles of 5-Hour Energy drinks were missing from Bree's final inventory.  (Doc. 21-1 p. 26).

Petrey Wholesale filed a police report and attempted unsuccessfully to locate Bree and inquire about the inventory shortage.  (Doc. 21-1 pp. 26, 38, 40).

Petrey Wholesale submitted an insurance claim to Great American showing, based on Rayburn's calculations, that 82,510 bottles of 5-Hour Energy drinks were missing from Bree's inventory.  (Doc. 21-1 pp. 35-36).  Great American denied the claim, relying in part on the inventory shortage exclusion in the policy.  (Doc. 21-1 pp. 46, 51, 172, 186-87).

### III.   Procedural History

On August 14, 2014, based on Great American's refusal to pay the insurance claim stemming from theft of Bree's route inventory, Petrey Wholesale filed a complaint against Great American for breach of contract.  (Doc. 1).  On September 11, 2014, Great American

filed a motion to dismiss, or, in the alternative, motion for summary judgment, arguing that, under the inventory shortage exclusion, it was not obligated to pay the claim.  (Doc. 9).

On September 24, 2014, prior to responding to the motion for summary judgment, Petrey Wholesale filed an amended complaint against Great American alleging breach of contract and bad faith failure to pay a claim.  (Doc. 16).  On October 8, 2014, Great American filed a motion to dismiss the amended complaint and motion for summary judgment, again arguing that it was not obligated to pay the loss under the inventory shortage exclusion.  (Doc. 18).  The motions to dismiss and motions for summary judgment are now under submission.

## IV.   Discussion

### A.   Applicability of the Inventory Shortage Exclusion

This is a diversity case involving an Alabama insurance contract; therefore, Alabama law governs the claims in this case.  *See Hartford Fire Ins. Co. v. Mitchell Co., Inc.*,  440 Fed. Appx. 759, 760 (11th Cir. 2011); *Dempsey v. Auto Owners Ins. Co.*, 717 F.2d 556, 559 (11th Cir. 1983).   Under Alabama law, Great American cannot be liable for Petrey Wholesale's bad faith or breach of contract claims unless the loss at issue is covered under the crime protection policy.  *See State Farm Fire & Cas. Co. v. Brechbill*,  144 So. 3d 248, 258 (Ala. 2013) (holding that breach of an insurance contract is one of the elements of a bad faith claim for failure to pay a claim).

Under Alabama law, when analyzing an insurance policy to determine whether

coverage exists, "a court gives words used in the policy their common, everyday meaning and interprets them as a reasonable person in the insured's position would have understood them.'" *State Farm Mut. Auto. Ins. Co. v. Brown*, 26 So. 3d 1167, 1170 (Ala. 2009) (quoting *Crossett v. St. Louis Fire & Marine Ins. Co.*, 289 Ala. 598, 603 (1972)). "'If, under this standard, they are reasonably certain in their meaning, they are not ambiguous as a matter of law and the rule of construction in favor of the insured does not apply.'" *Id*. (quoting *Crosset*, 289 Ala. at 603).

In this case, the employee dishonesty policy covers loss of property "resulting directly from dishonest acts committed by an employee, whether identified or not, acting alone or in collusion with other persons, with the manifest intent" to cause the employer to sustain loss, and also to obtain financial benefit for the employee or some other person that the employee intends to receive financial benefit. (Doc. 21-1 p. 46). However, as Great American points out, the employee dishonesty policy contains an exclusion which provides that Great American

> will not pay for . . . [l]oss, or that part of any loss, the proof of which as to its existence or amount is dependent upon:  a.) an inventory computation; or b.) a profit and loss computation.

(Doc. 21-1 pp. 46, 51).

Here, as proof of the existence and amount of the loss of 82,510 bottles of 5-Hour Energy Drinks, Petrey Wholesale offers a calculation based on comparing the results of the January 15, 2013 and June 28, 2013 physical inventories of items in Bree's truck and storage

unit after accounting for all interim shipments, recorded sales, and return merchandise shipments. (Doc. 21-1 p. 36). Petrey Wholesale also "ran a complete item comparison of the June 28th physical inventory count with the computer generated perpetual count, then extend[ed] the differences at unit inventory cost," which "revealed [a] shortage of 82,510 bottles of 5-Hour Energy product with a cost of $11,415.35. *Id.* Neither party has cited (and the court has not found) an Alabama case defining the term "inventory computation" as used in the inventory shortage exclusion at issue. However, Petrey Wholesale appears to concede that these calculations are "inventory computations" within the meaning of the exclusion, and the court concludes that they are. *Cf. Fid. & Deposit Co. of Md. v. So. Utils., Inc.*, 726 F.2d 692, 695 (11th Cir. 1984) ("An inventory computation is '"an inventory arrived at by taking a beginning inventory, adding purchases and deducting the cost of merchandise sold."'" (quoting *Chenoweth-Chapman Corp. v. Amer. Ins. Co.*, 553 S.W.2d 872, 876 (Mo. App. 1977, quoting in turn *Fort Smith Tobacco & Candy Co. v. Amer. Guar. & Liab. Ins. Co.*, 208 F. Supp. 244, 254 (W.D. Ark. 1962)); Russell G. Donaldson, J.D., *Construction and Effect of Clause in Fidelity Bond or Insurance Policy Excluding from Coverage Losses Proved by "Inventory Computation" or "Profit and Loss Computation,"* 45 A.L.R.4th 1049 § 3[a] (Westlaw 2011) (collecting cases holding that "an 'inventory computation' [is] a figure arrived at by taking a beginning inventory, adding purchases, and deducting the cost of merchandise sold, so that a computed inventory loss would therefor be the difference arrived at by deducting an actual inventory from the inventory computation"); 11 Steven Plitt, *et al.*,

Couch on Ins. 3d § 161.12 (Westlaw 2014) ("The exclusion does not bar an inventory made upon a unit basis, but does bar inventory which requires computation to reduce them to some other basis, or where, when one inventory is compared with a later one, it is necessary to compute and allow for sales and purchases made in the interim.").

Although Petrey Wholesale concedes that its proof of loss is dependent upon inventory calculations, it argues that the phrase "dependent upon," as used in the inventory shortage exclusion, applies only when proof of loss is *wholly* dependent upon, but not *partially* dependent upon, inventory calculations.  In support of this contention, Petrey Wholesale cites *American Fire & Casualty Co. v. Burchfield*, 232 So. 2d 606 (Ala. 1970). In *Burchfield*, the Alabama Supreme Court concluded that a similar inventory exclusion did not preclude "use of inventory calculations to show the amount of the loss" after the insured offered other "evidence without conflict that it has suffered loss by reason of theft by . . . its employees, and has offered further evidence that no other basis exists to explain the loss." 232 So. 2d at 609.  Thus, in *Burchfield*, the court permitted the use of inventory calculations to show the amount of a loss where the insured offered evidence that it had discovered its employees stealing from its warehouse and the employees admitted to the theft.

Petrey Wholesale argues that, in addition to inventory calculations, it has provided other evidence of the existence of a loss due to employee dishonesty in the form of an affidavit of its chief financial officer, Norman Parks. (Doc. 21-1 p. 19).  In his affidavit, Parks states that "the proof of the existence of the loss is the missing items themselves," but

Parks relies on nothing other than inventory calculations as the basis of his knowledge that items were missing.  (Doc. 21-1 pp. 26, 28).  Thus, Parks's affidavit does not provide any independent corroboration of the existence of a loss apart from inventory calculations.

The court notes that Parks's affidavit indicates that, according to company policy, inventory in Bree's care was supposed to be kept locked in an offsite storage unit and in his truck, and that Petrey Wholesale's employees changed the locks on Bree's storage unit on the day he was fired.  (Doc. 21-1 pp. 24-26).  However, evidence suggesting that only Petrey Wholesale's employees could have been responsible for the disappearance of inventory in Bree's care is *not* independent evidence of a loss due to dishonesty or theft.  The existence of the loss is presupposed on the basis of inventory records alone, and the manner of the loss, if one existed, is a matter of speculation.  Even if Petrey Wholesale's employees were the only ones who *could* have stolen Bree's inventory, there is no evidence, apart from inventory calculations, that any inventory *was* in fact stolen by anybody.  Moreover, there is no independent evidence that employee dishonesty was responsible for any loss of inventory, rather than, for example (among a number of possibilities), employee negligence in following company policies for securing the goods.  *See* Doc. 21-1 p. 46 (employee dishonesty provision in the Great American policy providing coverage for loss due to "dishonest acts committed by an employee . . . acting alone or in collusion with other persons, with the manifest intent" to cause the employer to sustain loss, and also to with the employee's intent to obtain financial benefit for himself or some other person); *see also Burchfield*, 232 So. 2d

14

at 609 (recognizing that the purpose of an inventory shortage exclusion is to limit the coverage of employee dishonesty policies to claims that are in fact due to employee dishonesty rather than to negligence, bookkeeping errors, waste, inexactness, pilferage by nonemployees, or dishonesty inherent in a claim "'built upon self-created inventory records.'" (quoting *Hoboken Camera Center v. Hartford Accident & Indem. Co.*, 93 N.J. Super. 484, 499 (1967)). *Cf. Dunlop Tire & Rubber Corp. v. Fid. & Deposit Co. of Md.*, 479 F.2d 1243, 1247 (2d Cir. 1973) (holding that, where inventory calculations indicated a shortage of goods stored in a locked wire cage accessible only to employees, the insured had provided "circumstantial evidence that, if a loss in fact was sustained, [the insured's] employees were the perpetrators. But this so-called evidence of employee dishonesty presupposes the factual existence of the loss. The evidence merely tends to foreclose the possibility of theft by persons other than employees. It does not prove the existence of any loss. There are no confessions, actual or implied, from employees who had been stealing goods. Dunlop has not shown suspicious circumstances indicating that employees were pilfering goods. The only evidence that a loss occurred at all is the inventory computations. Such computations alone are insufficient to prove the existence of the loss in light of the prohibition of the inventory exclusion clause.").

Thus, Petrey Wholesale's reliance on *Burchfield* is misplaced because inventory calculations are the *only* evidence Petrey Wholesale has offered as proof of the existence of a loss due to employee dishonesty as defined by the policy.  Accordingly, the court concludes

15

that Petrey Wholesale's loss is not insured under terms of the policy.

**B.    The Inventory Shortage Exclusion Does Not Render Coverage Illusory**

Citing *Burchfield*, Petrey Wholesale argues that the inventory coverage exclusion renders coverage for employee dishonesty illusory because, according to Petrey Wholesale, inventory calculations are the only available means to prove the existence of a loss of inventory due to employee dishonesty.  In *Burchfield*, the Alabama Supreme Court noted with approval that a New Jersey court had indicated that the exclusion would "nullify to a considerable extent" the benefits of an employee dishonesty policy if the exclusion was interpreted according to its literal meaning without allowing use of inventory calculations alongside some other wholly separate evidence proving the existence of a loss due to employee dishonesty.  *Burchfield*, 232 So. 2d at 609 (citing *Hoboken Camera Center v. Hartford Accident & Indem. Co.*, 93 N.J. Super. 484, 496 (1967)).

Contrary to Petrey Wholesale's interpretation of *Burchfield*, however, this is far from a holding that the exclusion renders coverage illusory if it excludes coverage in cases where, as here, inventory calculations are the sole proof of loss due to employee dishonesty. The purpose of *any* exclusion in an insurance policy is to "nullify" the availability of coverage to *some* extent, and insurers "have the same right as individuals. . . to impose whatever conditions they please upon their obligations not inconsistent with public policy."  *Ala. Farm Bureau Mut. Cas. Ins. Co. v. Goodman*, 279 Ala. 538, 541 (Ala. 1966).  Under Alabama law, an exclusion renders coverage illusory, and is unenforceable as against public policy, only

when it "'*completely* contradict[s] the insuring provision.'"  *Shrader v. Emp'rs Mut. Cas. Co.*, 907 So. 2d 1026, 1033 (Ala. 2005) (quoting *Indus. Chem. & Fiberglass Corp. v. Hartford Accident & Indem. Co.*, 475 So.2d 472, 479 (Ala. 1985) (emphasis added)). Nullifying coverage "to a considerable extent," *Burchfield*, 232 So. 2d at 609, is not the same thing as "completely contradicting" an insuring provision and thus rendering it illusory, *Shrader*, 907 So. 2d at 1033.

The inventory shortage exclusion is "a standard clause that appears in virtually every employee dishonesty policy" and "has been construed by a number of courts," including in numerous cases where coverage was found to exist.  *Burchfield*, 232 So. 2d at 609; *see also Coleman Cable, Inc. v. Travelers Indem. Co.*, 790 F. Supp. 2d 742, 755-56 (N.D. Ill. 2011) ("The type of exclusion upon which Federal relies, known as an inventory shortage exclusion, is hardly new to the insurance industry.").  As noted in part IV. A. of this opinion, the purpose of the inventory shortage exclusion is widely recognized not (as Petrey Wholesale contends) to serve as a surreptitious and complete contradiction of the coverage provided in employee dishonesty policies, but to protect insurers from the dangers of negligence, bookkeeping errors, waste, inexactness, pilferage by nonemployees, or dishonesty inherent in a claim "built upon self-created inventory records."  *Burchfield*, 232 So. 2d at 609; *see also*, *e.g. Coleman Cable, Inc. v. Travelers Indem. Co.*, 790 F. Supp. 2d 742, 755-56 (N.D. Ill. 2011) ("[I]nventory shortage exclusions have long been used to curb abuses by employers insured against employee dishonesty where covered losses were claimed

on the basis of mere estimates, but where the losses might actually be the result of bookkeeping errors, waste, or negligence." (citations and internal quotation marks omitted)); *Donaldson*, 45 A.L.R.4th 1049 § 2[a] (discussing the purpose of inventory shortage exclusions); Carleton Burch, *et al.*, 15 Fidelity L.J. 309 (Oct. 2009) ("Over time, the most commonly used fidelity forms have developed exclusions to limit or prohibit the introduction of proof of loss through inventory computations. These forms have recognized that inventory shrinkage, as shown in such calculations, can arise from any number of sources, some or all of which may or may not bear any direct relation [to dishonesty] by an employee.").

Contrary to Petrey Wholesale's contention, inventory calculations are not the only means available for proving the existence of a loss of inventory due to employee dishonesty. Other calculations based on regularly kept business records are permissible as proof so long as they are not inventory calculations. *E.g., Atlanta Coca-Cola Bottling Co. v. Transamerica Ins. Co.*, 61 F.R.D. 120 (N.D. Ga. 1973) (holding that the exclusion did not preclude an insured from relying on the daily records of allegedly dishonest routemen who serviced soft drink machines). For example, it has been held that an "inventory calculation" does not occur when items in a store or warehouse are individually marked and accounted for when sold so that the insured could show from its records that individually-identifiable items are missing. *See*, *e.g.*, *Hoboken Camera*, 93 N.J. Super. at 491 n.2 (one of two cases that the Alabama Supreme Court expressly followed in *Burchfield*); *see also, e.g.*, *Sun Ins. Co. v. Cullum's Men Shop*, 331 F.2d 988, 991 (5th Cir. 1964) ("[P]roof of the amount of the loss

18

did not depend upon an inventory computation . . . but on the contrary consisted of an enumeration of each missing item . . . based upon a check of the stock record . . . against the stock actually on hand"); *Ace Wire & Cable Co., Inc. v. Aetna Cas. & Sur. Co.*, 60 N.Y.2d 390, 659 (N.Y. 1983) (holding that it was not an "inventory computation" to prove "the fact or amount of loss through inventory records (whether perpetual or periodically made) detailing the actual physical count of individually identifiable units," such as stock records of the reels of wire in which "each reel is separately listed with a notation of the exact footage on the reel[,] and on many items a specific control number is assigned to the reel").

Further, as Petrey Wholesale itself recognizes, evidence other than business records can be used to prove a loss due to employee dishonesty, such as security camera footage, evidence that an employee destroyed records and abandoned his job when he became aware that a theft was about to be discovered, eyewitness statements that an employee removed items from a warehouse, confessions of dishonest employees, evidence that a dishonest employee sold the items for personal gain, and records of deliveries of items that were in fact never delivered. *Cf.*, *e.g.*, *So. Utils., Inc.*, 726 F.2d at 695-97; *Burchfield*, 232 So. 2d at 607.

Moreover, in light of the plain language of the policy, the fact that inventory shortage exclusions have long been the industry standard in employee dishonesty policies, *Burchfield*, 232 So. 2d at 609, and Petrey Wholesale's statement that it obtained the employee dishonesty policy precisely because of the potential for inventory theft by route salesmen  (Doc. 21-1 pp. 13, 27), the court is particularly unconvinced by Petrey Wholesale's argument that

19

coverage is illusory because it could not reasonably have foreseen the need to implement security measures or record-keeping procedures that would allow for proof of loss independent of an inventory calculation in accordance with the requirements of the exclusion.

In short, the inventory shortage exclusion by no means "completely contradicts" the coverage provided by the employee dishonesty policy.  Because the inventory shortage exclusion does not "completely contradict" the insurance coverage provided by the employee dishonesty policy, the exclusion does not render the coverage illusory.  *Shrader*, 907 So. 2d at 1033 (defining "illusory coverage").

## C.    Waiver

Petrey Wholesale points out that, under similar[2] circumstances, Great American paid a claim for theft by Jason McKean in 2011 after Petrey Wholesale provided a proof of loss that involved inventory computations.  Petrey Wholesale argues that, by paying the claim for theft by McKean, Great American waived its right to rely on the inventory shortage exclusion to deny coverage for the claim for theft by Justin Bree.  However, Petrey Wholesale cites no

---

[2]The circumstances of the two claims were similar in that inventory calculations were submitted as proof of loss.  However, McKean abandoned his job and his truck shortly before the time that a physical inventory would have been expected to take place, and Petrey Wholesale discovered the disappearance of inventory at the same time it discovered McKean's disappearance, prior to conducting an inventory calculation.  (Doc. 21-1 p. 71).  Bree did not leave his employment under suspicious circumstances; his employment was terminated for reasons unrelated to theft, and he was not suspected of theft until inventory calculations conducted a month after his termination indicated an inventory shortage.  *See So. Utils., Inc.*, 726 F.2d at 695-97 (holding that an inventory exclusion did not preclude coverage where, in addition to inventory calculations, the insured provided evidence of loss due to theft by providing evidence of the suspected employee's "actions that were consistent with dishonesty, such as . . . clearing out his desk and leaving his job several hours after being told by his superior to explain discrepancies in the construction records").

legal authority in support of this contention.

Moreover, under Alabama law, "the doctrine [of waiver] is not available to bring within the coverage of a policy risks not covered by its terms or risks expressly excluded therefrom."   *Home Indem. Co. v. Reed Equip. Co.*, 381 So. 2d 45, 50-51 (Ala. 1980); *see also Woodall v. Alfa Mut. Ins. Co.*, 658 So. 2d 369, 372 (Ala. 1995) ("If a coverage provision or an exclusion is unambiguous, it is not subject to waiver or estoppel.").   Therefore, Great American's payment of the claim for theft by Jason McKean does not operate as a waiver of the inventory shortage exclusion in this case.   *Cf. Payne v. Mutual Sav. Life Ins. Co.*, 58 So. 3d 108 (Ala. 2010) (holding that, "regardless of the reason" the insurer paid claims in excess of $8,000 for the insured's chemotherapy drugs in 2007 and 2008, the doctrine of waiver did not preclude the insurer from denying coverage in 2009 based on an unambiguous policy provision that placed an $8,000 maximum yearly limit on prescription drug coverage).

## V.   Conclusion

Accordingly, it is

**ORDERED** as follows:

1.   that the motion to dismiss and for summary judgment (Doc. 18) filed by Great American be and is hereby **GRANTED**;

2.   that Great American's motion to dismiss and for summary judgment (Doc. 9) be and is hereby **DENIED** as moot;

3.   that judgment on all claims in the amended complaint be and is hereby entered in

21

favor of Great American and against Petrey Wholesale and that Petrey Wholesale's

claims be and are hereby **DISMISSED** with prejudice;

4.    that all pending deadlines are terminated and all other pending motions are hereby

**DENIED** as moot; and

5.    that the costs of this proceeding be and are hereby taxed against the Plaintiff.

A separate final judgment will be entered.

Done this 30th day of January, 2015.


_____/s/Charles S. Coody_____
CHARLES S. COODY
UNITED STATES MAGISTRATE JUDGE

22